In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3881

Village of San Jose, a Municipal
Corporation,

Plaintiff-Appellant,

v.

Daniel L. McWilliams and Ida M. McWilliams,

Debtors-Appellees.

Appeal from the United States District Court
for the Central District of Illinois.
No. 01 C 3116--Richard Mills, Judge.

Argued March 1, 2002--Decided March 27, 2002

   Before Flaum, Chief Judge, and Bauer and
Harlington Wood, Jr., Circuit Judges.

   Bauer, Circuit Judge.  The debtors filed
for bankruptcy protection under Chapter 7
of the Bankruptcy Code. The Village of
San Jose, a lien creditor, opposed the
discharge on the ground that within one
year of filing the petition the debtors
hindered, delayed, or defrauded the
Village by transferring or concealing
property. 11 U.S.C. sec. 727(a)(2). The
bankruptcy judge granted the discharge,
finding the debtors' subsequent remedial
conduct of disclosing and recovering the
properties negated the pre-petition
conduct. The Village then appealed to the
district court, which affirmed the
bankruptcy judge's ruling. Though the
Village stated that the debtors have no
discernable method to pay the amount
owed, bankruptcy or not, the Village
nevertheless seeks its "pound of
flesh"/1 in this court. After a
thorough review, we find that the
bankruptcy court erred, and reverse and
remand for further proceedings not
inconsistent with this opinion.
BACKGROUND

   The Village of San Jose, Mason County,
Illinois, is a small enclave of some 696
people, located approximately twenty
miles south of Pekin, Illinois./2

Daniel and Ida McWilliams owned a number of properties and buildings in the Village of San Jose. The main property at issue was a two-story brick building built in the late 1800s, which housed a restaurant at one time. The building, located at 120 West Vine, was fairly large, approximately 70 x 100 feet, occupying 10,000 square feet.

In a letter dated January 4, 1999, Daniel McWilliams was notified that the building was condemned after inspection by a Village health officer. According to the health officer, the roof was sagging, there was a hole in it, and contents were falling into the structure. In a March 4, 1999 letter, the Village notified the McWilliamses that they must either repair or demolish the building, and if they failed to act, the Village would demolish it and charge the costs to them. The McWilliamses obtained an estimate that it would cost approximately $48,000 to repair the building. The McWilliamses neither repaired nor demolished the building, stating they were unable to pay for either action. On March 26, 1999, the Village moved to demolish the building and recover the costs of the demolition and attorney's fees incurred pursuant to 65 ILCS 5/11-31-1 (West 2001). An order was entered in state court on July 2, 1999, permitting the Village to demolish the building, effective July 22, 1999./3 The court also granted the Village a lien on the property to satisfy the costs of demolition.

On September 3, 1999, Daniel and Ida McWilliams conveyed several lots, by quitclaim deed, to their four grandchildren for "One ($1.00) Dollar and Love." Prior to transferring the properties, the McWilliamses satisfied the outstanding mortgages with the San Jose Tri-County Bank. The deeds were recorded as transferred to the grandchildren with the proper government officials, but the deeds were not physically delivered to the grandchildren.

In February 2000, the Village filed a supplemental motion in state court to set aside the transfers under the Uniform Fraudulent Transfer Act (UFTA), 740 ILCS 160/5 (West 2001). The McWilliamses voluntarily filed for bankruptcy protection on March 15, 2000. The

Bankruptcy Trustee held the first meeting of the creditors on April 10, 2000. The McWilliamses have some 28 creditors and the Village is the largest.

The following assets were disclosed in the creditors' meeting: Ida McWilliams was employed making roughly $600 per month at one job, and $500 per week at a second job. Daniel McWilliams is disabled and receives only $937 a month in Social Security Disability benefits, but he did receive a $40,000 worker's compensation settlement at the time of injury. He has been disabled since a 1984 accident at work. The McWilliamses own a home at 400 W. Vine, and two adjoining lots at 402 and 404 W. Vine. There is a house on 402 W. Vine, which the McWilliamses rent out for $300 per month. The properties at 400, 402, and 404 W. Vine have a combined value of approximately $51,000. All three properties have mortgages on them. The McWilliamses also own a commercial building on 320 S. Second, and are two years into a four year installment sales contract for $200 per month for the property. The 320 S. Second property is unencumbered. They also own a 1998 Ford Taurus and a 1988 Ford Ranger, both of which have liens on them.

During the creditors' meeting, the Trustee inquired if the McWilliamses had sold, exchanged, or given away anything of value recently. Ida McWilliams responded "no." The Trustee then specifically asked about the lots conveyed to the grandchildren. Daniel McWilliams stated that they did convey the lots in September 1999, and that their value was $2,000 each. Daniel McWilliams added that they conveyed the lots "six months before we got a bill from San Jose lawyer on what we owed them that was the reason we had to file bankruptcy."

The Village filed an objection to the McWilliamses bankruptcy petition and discharge on April 10, 2000. On May 10, 2000, the grandchildren reconveyed the lots at issue back to Daniel and Ida McWilliams. A hearing was held on February 6, 2001, before the bankruptcy judge. The McWilliamses appeared pro se at the hearing, stating they could no longer afford an attorney./4 During the first few minutes of the hearing, the bankruptcy judge made his opinion of the

case known to the Village's attorney.

I think on this, and I know that I have talked to you about this in the pretrial, talked to you about it on other occasions, I am not going to deny their discharge under 727(a)(2). It's been my policy, and I think it's good law, that if I file a petition that says I made these transfers and the Trustee said those are invalid, correct that, I am not going to deny a discharge. They have made no attempt to conceal anything to this Court or to the Bankruptcy Trustee. That's the purpose of the 727(a)(2) in my opinion. And you can pull out a number of cases . . . and I don't care what those say.

. . . [L]et's move on, okay. You are not going to convince me to change my mind on this. I have told you that from the day you filed it.

After the hearing, consistent with his prior comments, the judge issued a ruling granting the McWilliams' petition. The Village appealed to the district court, which affirmed the bankruptcy court's ruling.

ANALYSIS

The bankruptcy court's factual determinations are reviewed for clear error and legal conclusions de novo. See, e.g., Cult Awareness Network, Inc. v. Martino (In re Cult Awareness Network), 151 F.3d 605, 607 (7th Cir. 1998) (noting that in bankruptcy cases on appeal from the district court, we use the same standard of review as the district court). The bankruptcy court interpreted 11 U.S.C. sec. 727(a)(2) as allowing a discharge even if the debtor violated the section, as long as the infraction was rectified and none of the creditors were harmed. The construction of the Bankruptcy Code is question of law we review de novo. See, e.g., In re Cult Awareness Network, 151 F.3d at 607.

The Village makes numerous arguments urging reversal, not the least of which is a constitutional due process argument. The Village argues that the bankruptcy judge decided the case before hearing its arguments. The district court found that the bankruptcy judge made his decision based on the pleadings and Trustee's

report; however, the bankruptcy court's order stated the determination the McWilliamses lacked the intent to defraud was based, in part, on testimony from the hearing. The district court noted that if the judge "was obligated to recuse himself from this case simply because he had read the pleadings before the hearing, no judge could ever come to court prepared." The district judge's comment was right on the mark, and we need not elevate this disagreement to a constitutional level when it is more appropriately framed as a ordinary review for error.

## A. Discharge in Bankruptcy

The purpose of the Code is to provide equitable distribution of the debtor's assets to the creditors and "to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." Williams v. United States Fid. & Guar. Co., 236 U.S. 549, 554-55 (1915). We construe the Bankruptcy Code "liberally in favor of the debtor and strictly against the creditor." Gullickson v. Brown (In re Brown), 108 F.3d 1290, 1292 (10th Cir. 1997); In re Reines, 142 F.3d 970, 973 (7th Cir. 1998); In re Adlman, 541 F.2d 999, 1003 (2d Cir. 1976); 11 U.S.C. sec. 727(a) (providing that, "[t]he court shall grant the debtor a discharge, unless . . ."). Thus, consistent with the Code, bankruptcy protection and discharge may be denied to a debtor who was less than honest. Grogan v. Garner, 498 U.S. 279, 286-87 (1991) ("But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'") (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)); Mayer v. Spanel Int'l Ltd., 51 F.3d 670, 674 (7th Cir. 1995) ("Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate, and we must respect that judgment."). If a creditor demonstrates by a preponderance of the evidence that the debtor actually intended to hinder, delay, or defraud a creditor, the court can deny the discharge. See In re Keeney, 227 F.3d 679, 683 (6th Cir. 2000); In re

Scott, 172 F.3d 959, 966-67 (7th Cir. 1999); cf. Grogan, 498 U.S. at 286-87. The intent to defraud must be actual and cannot be constructive; however, because it is unlikely that the debtor will admit fraud, intent may be established by circumstantial evidence. See In the Matter of Krehl, 86 F.3d 737, 743-44 (7th Cir. 1996); Smiley v. First Nat'l Bank of Belleville (In the Matter of Smiley), 864 F.2d 562, 566 (7th Cir. 1989).

B.  Objections to Discharge Based on Section 727(a)(2)

   In order to succeed with an objection to discharge based on section 727(a)(2), the creditor must prove:

(1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition; (2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code; (3) that the act was that of the debtor or his duly authorized agent; (4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

Lee Supply Corp. v. Agnew (In the Matter of Agnew), 818 F.2d 1284, 1287 (7th Cir. 1987) (citation omitted). The facts show that three of the four elements were met. The issue was whether the second element, actual intent, had been met. Though actual intent is difficult to prove, it may be shown through circumstantial evidence, and the Fifth Circuit adopted a series of factors which, if proven, indicate actual fraud:

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the

events and transactions under inquiry.

> Pavy v. Chastant (In the Matter of Chastant), 873 F.2d 89, 91 (5th Cir. 1989) (citation omitted). If the creditor can show that one or some of these factors are met, "[t]his creates a presumption of an intent to defraud establishing plaintiff's prima facie case and shifting . . . the burden [to the debtor-defendant] of demonstrating that he lacked fraudulent intent." Id.

The McWilliamses did transfer the properties for $1.00 and love to their grandchildren, retained possession of the deeds, and transferred the properties after they had been notified that the Village demolished the building and would seek to recoup the costs from them. This circumstantial evidence demonstrates the McWilliamses transferred the properties to either conceal or prevent the Village from obtaining them to satisfy their debts. The bankruptcy court similarly found that several of these factors were met, yet concluded that the McWilliamses did not make the transfers "with the intent to hinder, delay, or defraud creditors." The bankruptcy court concluded that the McWilliamses cured the fraud and redeemed themselves by disclosing of the transfers and subsequently recovering the properties.

1. Redemption for a Less Than Honest Debtor

Though it does not cite a specific case in support, the bankruptcy court's reasoning is in line with a doctrine announced in First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339 (9th Cir. 1986). In Adeeb, the Ninth Circuit allowed the granting of a discharge petition over a creditor's objections because the debtor disclosed the previous transfers to the creditors and was making a good-faith effort to recover the property at the time an involuntary bankruptcy petition was filed. Id. at 1346. Adeeb, after being threatened by this creditors, consulted with an attorney who advised him to transfer title to several parcels of property to third parties for no consideration. Id. at 1341. After consulting with a second attorney, Adeeb told his creditors about the transfers, and the creditors filed for an

involuntary bankruptcy. Id. Adeeb attempted to recover the properties, and the creditors objected to the discharge based on section 727(a)(2). Id. The Ninth Circuit interpreted the term "transfer" in section 727(a)(2) "to mean 'transferred and remained transferred'" because, they concluded, Congress intended to deny discharge only to debtors who try to keep assets hidden "until after they obtain their discharge in bankruptcy." Id. at 1344-45.

Adeeb, as other courts have concluded, appears to contravene the plain language of the Code. See, e.g., Davis v. Davis (In re Davis), 911 F.2d 560, 562 (11th Cir. 1990) (per curiam) ("Congress certainly was capable of drafting a statute which would deny a discharge only when assets were fraudulently transferred and remained transferred at the time of filing of bankruptcy proceedings, but it did not."). However, the Ninth Circuit felt that this exception would "encourages honest debtors to recover property they have transferred" and permit an "honest debtor to undo his mistakes and receive his discharge." In re Adeeb, 787 F.2d at 1345. This reasoning is not persuasive because the debtor was in fact dishonest, he tried to hide assets from creditors, and only after the debtor discovered he would likely be caught and pay a penalty did he reverse the transfers. Furthermore, section 727(a) already encourages debtors to be honest, or they will not be able to obtain a discharge; additional incentives need not be judicially created. See Martin v. Bajgar (In re Bajgar), 104 F.3d 495, 501 n.3 (1st Cir. 1997) ("[I]t is likely that our decision, by denying discharge, will facilitate this outcome by deterring petitioners from fraudulently transferring property within one year of filing a voluntary bankruptcy petition in the first place.") (emphasis added).

Even though Adeeb purports to interpret the term "transfer" in section 727(a)(2), the facts surrounding the case and analysis reveal the court focused on the equities. "We are also persuaded by practical considerations that a discharge should not be denied in the present situation." In re Adeeb, 787 F.2d at 1345. Rather than finding Adeeb lacked the intent to defraud, the court was forced to go another route because it was

clear that Adeeb transferred the properties with full knowledge and actual intent to hinder, delay, or defraud his creditors. Id. at 1341–43. In considering the same issue, the First Circuit concluded that expanding the definition of "transfer" based on equitable considerations "'has no place under the Code to the extent the statute addresses the question.'" In re Bajgar, 104 F.3d at 498 (quoting Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1189 (7th Cir. 1989)).

Further, Adeeb is not on all fours with this case. Adeeb's holding was limited to involuntary petitions, and any commentary on voluntary petitions was dicta. In re Adeeb, 787 F.2d at 1346. Unlike Adeeb, the McWilliamses recovered the property on May 10, 2000, only after they filed a voluntary petition for bankruptcy on March 15, 2000. See In re Bajgar, 104 F.3d at 499–500 (distinguishing In re Adeeb because in voluntary bankruptcies "'[t]he Ninth Circuit requires actual reconveyance of the fraudulently transferred property before the bankruptcy filing.'") (citation and emphasis omitted). Moreover, the McWilliamses disclosed the transfers and recovered the properties in March 2000, well after the Village discovered the transfers and filed a motion to set them aside under the UFTA in February 2000. Cf. In the Matter of Smiley, 864 F.2d at 566 ("The policy behind the Adeeb decision . . . is not applicable here where property was recovered only as a result of the action of the bankruptcy trustee and court."). Though they had disclosed the transfer in their petition, when asked by the Trustee if they had transferred anything in the past year, Ida McWilliams responded "no." It was not until the Trustee asked a second specific question about the properties did Daniel McWilliams acknowledge the transfers. By the time the McWilliamses rectified the fraud, the Village had already expended considerable efforts to recover the properties and prevent the discharge in bankruptcy. Cf. In re Davis, 911 F.2d at 561 n.2 ("The creditor presumably incurred legal fees and expenses when he brought an action challenging the fraudulent transfer."). Even if the Village did not suffer any harm, the McWilliams' intent to defraud is all that is needed for a petition to be denied

under section 727(a)(2). See, e.g., In the Matter of Krehl, 86 F.3d at 744 n.4 ("Yet so long as the debtor acted with the requisite intent under Section 727(a)(2), his discharge may be denied even if creditors did not suffer any harm."); In the Matter of Smiley, 864 F.2d at 569.

2.  Property Transfer

In the final paragraph of its ruling, the bankruptcy court noted that it did not believe the conveyance of the deeds was valid under Illinois law because the McWilliamses did not physically deliver the deeds to their grandchildren. Under Illinois law, "delivery of a deed is essential to the operation and validity of a conveyance," but physical delivery is only one means of completing the transfer. See, e.g., Calcutt v. Gaylord, 114 N.E.2d 340, 343 (Ill. 1953). "Delivery is determined by the intention of the grantor manifested by words and acts or the circumstances surrounding the transaction," and "[t]he intent to deliver may be shown by direct evidence or presumed from acts and declarations of the parties . . . ." Id.; Herron v. Underwood, 503 N.E.2d 1111, 1118 (Ill. App. 5th Dist. 1987). The McWilliamses have consistently maintained that they intended to make an innocent gift of the properties to their grandchildren. If we accept the bankruptcy court's interpretation, it would have been unnecessary for the McWilliamses to have their grandchildren properly execute and file deeds reconveying the properties back to the McWilliamses.

Moreover, we believe that the term "transfer" in the Code is defined broadly enough to encompass the transfer in this case. Cf. Grogan, 498 U.S. at 284, 289 ("Congress amended the Bankruptcy Act in 1970 to make nondischargeability a question of federal law independent of the issue of the validity of the underlying claim."). "Transfer" is defined as: "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. sec. 101(54).

"'Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is not transfer of title . . . .'" In the Matter of Smiley, 864 F.2d at 565 (quoting S. Rep. No. 95-989, 95th Cong., 2d Sess. 26–27 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5813, on the Bankruptcy Reform Act); see also In re Bajgar, 104 F.3d at 498-99 ("[T]he legislative history of Section 101(54), which defines 'transfer,' explains that '[t]he definition of transfer is as broad as possible.' Limiting the definition of 'transferred' to 'transferred and remained transferred,' in fact, would contradict the drafters' intent.") (quoting S. Rep. No. 989, 95th Cong.) (citations omitted); In re Davis, 911 F.2d at 562. The recording of the deeds and acceptance of consideration demonstrates that the conveyance in this case was a "transfer" under the definition in 11 U.S.C. sec. 101(54).

Whether the McWilliams' actions are defined as a "transfer" or "concealment," it is clear that they attempted to hide the property from their creditors. The recording, but failure to deliver the deeds, demonstrates the McWilliamses attempted to create the appearance that they no longer owned the property. Thus, even if the property was not found to have been "transferred," it could be found to have been "concealed." See In re Keeney, 227 F.3d 679, 682-83 (6th Cir. 2000) (quoting the bankruptcy court's finding that the debtor concealed property by having it titled "'in his parents' names'" while retaining a beneficial interest in it); Friedell v. Kauffman (In re Kauffman), 675 F.2d 127, 128 (7th Cir. 1981) (per curiam) ("The transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment."). However, the fact that the McWilliamses did later disclose the transfer when they filed their petition might, in other circumstances, mitigate the concealment. See Gullickson v. Brown (In re Brown), 108 F.3d 1290, 1293 (10th Cir. 1997) (distinguishing between "concealment" and "transfer" in section 727(a)(2), and finding that the debtor transferred but did not conceal the transaction because he placed it on his

bankruptcy schedules). In this case, it is more likely that the disclosure was prompted by the fact that the Village had discovered the transfer and moved to have it set aside under the UFTA.

The McWilliamses are certainly unfortunate debtors, yet they are not exactly honest debtors either. From the transcript of the hearing and the bankruptcy court's ruling, there is little doubt that the judge empathized with the McWilliamses, and because they disclosed the conduct and reconveyed the properties the judge felt there was no harm done. The counsel for the Village was also quite displeased with this outcome, and despite the judge's admonishment that an appeal would be a waste of money, pursued the action with two appeals. As the bankruptcy judge, we are confounded as to the Village's vigorous pursuit of this case because it is unlikely that the Village will see any financial gain, and any benefits will likely be offset by attorney's fees. The McWilliamses appeared pro se at oral arguments before this court and we too were not unmoved by their plight, but the Village's objections are clearly valid under the law./5

CONCLUSION

In enacting the Bankruptcy Code, Congress has determined that attempts, successful or not, to conceal, transfer, remove or destroy property cannot be later cured by remedial conduct, including undoing any transfers, if the transfer occurred within one year of filing the bankruptcy petition. The debtors in this case cannot shield themselves from a creditor's objections, based on section 727(a), through attempts to remedy the fraud by disclosing the transfers and reconveying the property after they filed for bankruptcy. The judgment of the bankruptcy court granting the debtors' discharge petition is therefore, Reversed and Remanded for further proceedings not inconsistent with this opinion. Circuit Rule 36 to apply to both the district and bankruptcy courts on remand.

FOOTNOTES

/1 William Shakespeare, The Merchant of Venice 1.3 & 4.1 (1596). According to the Village's attorney

this appeal is not about the debt (bond); it is a "matter of principle." Similarly, in The Merchant of Venice, Shylock, the money lender, when offered several times the debt (bond) refused stating the bond was forfeit and he wanted his "pound of flesh." Id. It was only through the rather creative reading of the law by Balthasar (a doctor of laws, who was in fact Portia in disguise) that the result was avoided. Id. Portia read the contract as allowing the taking of the pound of flesh, but not the drawing of any blood (because it was not mentioned). Id. As we shall see, no such creative reading of the law was available here to save the debtors' petition.

/2 See Census Bureau, U.S. Dep't of Commerce, Profiles of General Demographic Characteristics 2000, 2594 (Issued May 2001). For those not familiar with Pekin, Illinois (population of 33,857), it is about 170 miles southwest of Chicago. Id. at 1759 & 2466. Also, San Jose actually straddles the border of Mason and Logan Counties, and the Census Bureau counted a little less than half of the population as residing in Logan County and a little over half as residing in Mason County. See id. at 848-865 & 1037-1050.

/3 The McWilliamses contend that the building was actually two buildings, and that the later amendment to the court demolition order permitting the demolition of the second building after the fact acknowledges this. The Village states that there was a single building with a lean-to attached, which shared a common wall, and that the amended court order simply recognized that there was a single building. A "lean-to" is defined as: "a wing or extension of a building having a lean-to roof" or "a rough shed or shelter with a lean-to roof." Merriam-Webster's Collegiate Dictionary 662 (10th ed. 1996). We need not resolve this point of contention as it does not alter our analysis.

/4 The McWilliamses had previously been represented by two different attorneys, one in the state proceedings and another initially in the bankruptcy proceedings. They told the bankruptcy judge that the attorneys with whom they spoke said it would cost them more than $3,000 "up front," and that the result would be the same with or without an attorney.

/5 In The Merchant of Venice, the Duke of Venice sought to find a way to deny Shylock his "pound of flesh," but admitted he must grant it under the law. Shakespeare, The Merchant of Venice at 3.3, 4.1.