**In re Thomas B. REILLY and Mary B. Reilly, Debtors.**

**Pleguar Corporation, Plaintiff,**

**v.**

**Thomas B. Reilly and Mary B. Reilly, Defendants.**

**Bankruptcy No. 07–24588–JES. Adversary No. 07–2248.**

United States Bankruptcy Court, E.D. Wisconsin.

Oct. 5, 2009.

John T. Domaszek, Joshua B. Levy, Crivello, Carlson, S.C., Milwaukee, WI, for Plaintiff.

Patrick B. Howell, Milwaukee, WI, for Defendants.

### DECISION

JAMES E. SHAPIRO, United States Bankruptcy Judge.

Pleguar Corporation has objected to a discharge in bankruptcy being granted to

1. The plaintiff withdrew § 727(a)(3) from its complaint and which section had originally been asserted as a separate basis for denial of discharge.

2. Throughout this decision, unless otherwise so stated, all references to the plaintiff shall also mean "Pleguar," and all references to the defendants shall also mean "the Reillys" or "the debtors."

Thomas B. and Mary B. Reilly, pursuant to §§ 727(a)(2), 727(a)(4)(A), and 727(a)(4)(C).[1]

This is a core proceeding under 28 U.S.C. § 157(b)(2)(J), and this court has jurisdiction under 28 U.S.C. § 1334.

### STATEMENT OF FACTS [2]

On November 1, 2000, JHB Security, LLC ("JHB Security") entered into an agreement for the purchase of assets from Chanabla Gizmo Co. Inc. whose name was later changed to and is now known as Pleguar Corporation ("Pleguar"). Pleguar is a corporation owned and operated by Terry Cullen, its sole stockholder.[3] Cullen was engaged in the business of providing security services and related activities, including ticket-taking and ushering, for various entertainment events, including sporting events, trade shows, concerts, and fairs. JHB Security is a limited liability corporation formed by Thomas and Mary Reilly, who are husband and wife and who were both active in its operations. Mary Reilly holds a 51% membership interest, and Thomas Reilly a 49% membership interest.

The purchase price in this asset purchase agreement was $750,000, of which $40,000 was paid at the closing. The remaining balance together with 7.9% interest was to be paid over an 8–year period by monthly payments of $10,000. Under the terms of this agreement, the physical assets, consisting of furniture, office sup-

3. The purchase agreement states that Cullen is Pleguar's sole stockholder. However, it is less clear because, in his testimony, Cullen declared that there was another stockholder, but added that he was "probably the majority holder." (July 23, 2009 Tr. pp. 128–129)

plies, computers, and miscellaneous other equipment, were valued at $29,920. The intangibles were valued at $720,080. These intangibles, including the trade name "RTM Event Services," rights to all pending contracts for security services, and a list of Pleguar's customers and employees, unquestionably comprised the majority of the value of the assets purchased from Pleguar.

In the Fall of 2002, JHB Security began experiencing financial difficulties. This caused the Reillys to stop making the $10,000 monthly payments to Cullen, which were then reduced unilaterally by the Reillys to $7,500 per month. The Reillys also discontinued receiving their salaries from JHB Security. Cullen continued to accept and then apply the reduced monthly payments to the balance due under the purchase agreement and made no demand to increase these monthly payments to $10,000 as set forth in the agreement. After December of 2006, all further monthly payments from the Reillys to Cullen stopped, leaving at that time an unpaid balance due of approximately $353,485.

When JHB Security started experiencing its economic downturn, the Reillys began exploring various options, including obtaining financing or selling JHB Security. When all attempts to refinance failed, the Reillys contacted potential purchasers. These potential purchasers included: Per Mar Security Services ("Per Mar"), Contemporary Services Corp. ("Contemporary Services"), and Midwest Family Broadcasting ("Midwest Family").

Per Mar was the first party that the Reillys approached in their attempt to sell the business in the Spring of 2006. In August of 2006, Per Mar informed the Reillys that it was not at that time interested in purchasing the business. In October or November of 2006, the Reillys next contacted Contemporary Services. There

was some discussion in connection with an offer from Contemporary Services to purchase the business for $150,000. However, Mrs. Reilly stated that it was not a firm offer, and the sale to Contemporary Services never materialized. Mrs. Reilly further testified that, after receiving this offer, she sent an e-mail to Contemporary Services stating that $150,000 was an extremely low offer and inquired whether Contemporary Services would reconsider by increasing its offer. No response was received. In November of 2006, all further discussions regarding any sale to Contemporary Services stopped. In late February or early March of 2007, the Reillys then commenced negotiations with a third party—Midwest Family—and the Reillys approached Midwest Family with an offer to sell the business for $750,000.

While the Reillys were negotiating with Midwest Family, they also began discussions with Atty Bruce A. Lanser, a bankruptcy attorney, to explore the possibility of filing a personal petition in bankruptcy.

During this same time period, Atty Shawn N. Reilly, who is a brother of Thomas Reilly and who represented JHB Security in the asset purchase agreement, contacted Atty Brendan J. Rowen, who had represented Cullen in the asset purchase agreement. This contact was an attempt to work out an arrangement in which the Reillys would return to Cullen all of the assets purchased by JHB Security in exchange for a forgiveness from Pleguar of the unpaid balance owing by the Reillys under the terms of the asset purchase agreement. Atty Reilly informed Atty Rowen that if Cullen commenced litigation on behalf of Pleguar against the Reillys, they would "have no option but to close the business and declare personal bankruptcy." (Pl.'s Ex. 2) Atty Rowen discussed this communication with Cullen, who responded that, before making any

firm decision about the Reillys's proposal, he needed to conduct a due diligence investigation. Cullen wanted answers to a number of questions and also wanted certain documents which he itemized in a written communication to Atty Rowen. Cullen ended this written communication to Atty Rowen by stating: "I am going to need some money from the Reillys if I take over the company in its run down condition." (Pl.'s Ex. 3) On February 18, 2007, Atty Rowen forwarded Cullen's written communication to Atty Reilly.

The Reillys declined to respond to Cullen's questions and demands for documents, having concluded, based upon Cullen's communication to his attorney, that there was no room for any further negotiations on their proposal for a resolution.

On February 26, 2007, Atty Reilly sent an e-mail to Atty Rowen informing him that the Reillys had been advised by Atty Lanser not to transfer the business assets because it would result in creating a preference. Atty Reilly further stated in this e-mail that he told the Reillys to try to keep the business operating until they filed their bankruptcy petition. (Pl.'s Ex. 11)

On March 13, 2007, Mr. Reilly sent to Per Mar a copy of the JHB Security standard security procedures and a copy of its policy manual. Mr. Reilly testified that this was done because by that time he recognized the possibility that JHB Security might "have to close the doors." (July 23, 2009 Tr. pp. 226–227), and he wanted to provide the JHB Security employees with the opportunity of re-employment with Per Mar.

On March 14, 2007, Pleguar commenced its lawsuit against JHB Security and the Reillys seeking a recovery of approximately $347,400.

On March 16, 2007, the Reillys became aware of a flyer mailed out by Cullen to current customers or potential customers of JHB Security. The flyer declared "We're Back" and stated in part "We're here to turn back the clock 30 years. Our goal is to provide you with the excellence and customer service that we're known for." (Pl.'s Ex. 1 Attach. E)

On March 20, 2007, Mr. Reilly informed Midwest Family, with which negotiations were still pending, of the Pleguar lawsuit brought against JHB Security and the Reillys. Midwest Family responded to Mr. Reilly that it would be unable to enter into any binding contracts with JHB Security until such time as this lawsuit was resolved.

On April 6 or April 7, 2007, the Reillys received an anonymous fax of a letter mailed by Cullen, presumably to the same recipients of the "We're Back" flyer, stating in part that the "Reillys are also telling tales of various, mysterious investors and purchasers who are coming to their aid—I am not aware of one shred of evidence to support their claims" and which letter labeled the Reillys as liars. (Pl.'s Ex. 1 Attach. E) After receiving this fax, the Reillys concluded that whatever good will was left in connection with the operation of their business was gone and that they could no longer continue with the business operations of JHB Security.

The final communication between the Reillys and Midwest Family occurred in the first week of April, 2007 when Mr. Reilly sent an e-mail to Midwest Family inquiring if it was still interested in purchasing JHB Security. There was no response from Midwest Family, which led the Reillys to conclude that there was no further interest by Midwest Family in purchasing this business.

On April 10, 2007, JHB Security completed its last event and closed its business operations.

In the week following April 10, 2007, Mr. Reilly mailed to Per Mar some JHB Security intangibles, which included a short list of 30 employees in the Madison, Wisconsin area with the names and contact numbers for these employees as well as information in connection with upcoming events for which JHB Security had commitments to fulfill in the Madison, Wisconsin area. These pending commitments involved approximately 10 to 12 different customers, and the information which Mr. Reilly provided to Per Mar consisted of the customer and pricing information, a copy of the RTM Event Services' invoices reflecting the projected employee hours which would be involved and the rates charged by JHB Security in connection with these events. Mr. Reilly testified that these intangibles were sent to Per Mar so that Per Mar would be able to fulfill the pending contracts with these JHB Security customers. Arrangements had been made by Mr. Reilly for Per Mar to honor the commitments under the JHB Security contract terms. Mr. Reilly stated that he also wanted to provide the JHB Security employees with the opportunity for re-employment. with Per Mar. Mrs. Reilly testified that: "We had commitments that were still out there that we agreed upon for us to perform but that we knew we couldn't." (July 24, 2009 Tr. p. 28 lines 4–6)

On April 17, 2007, Mr. Reilly executed an assignment to Per Mar of a telecommunications service agreement between JHB Security and TDS Metrocom regarding the JHB Security telephone number. This was done in order to transfer this telephone number to Per Mar in exchange for Per Mar paying the $672 balance due from JHB Security to TDS Metrocom. Mr. Reilly said that Per Mar declined to pay this debt, and the telephone line was disconnected. However, Mr. Reilly subsequently learned that Per Mar later was nevertheless able to obtain the JHB Security telephone number.

On June 14, 2007, the Reillys filed a joint personal voluntary petition in bankruptcy under chapter 7.

On October 2, 2007, Pleguar commenced this adversary proceeding against the Reillys.

## ANALYSIS

 The court recognizes that a denial of a debtor's discharge is a harsh remedy and that denial of such discharge must be construed liberally in favor of the debtor. *In re Koss,* 403 B.R. 191 (Bankr. D.Mass.2009). At the same time, the court also recognizes that a discharge is not a right but is a privilege available only to honest debtors. *Id.* at 215. The burden of proof for denial of discharge is upon the proponent to establish grounds for denial of discharge by a preponderance of the evidence. *In re Serafini,* 938 F.2d 1156 (10th Cir.1991).

### Sec. 727(a)(2)—Fraudulent Transfer or Concealment of Property

 One ground asserted by Pleguar for denial of discharge is § 727(a)(2). The purpose of this section is to prevent a discharge to a debtor who is attempting to avoid payment to his or her creditors by concealing or otherwise disposing of assets. Sec. 727(a)(2) requires proof of the following:

1. act complained of done within one year before filing of bankruptcy petition,
2. act was done with actual intent to defraud,
3. act was done by the debtor, and
4. act consists of transferring or concealing property of the debtor.

Pleguar asserts that the Reillys transferred the intangibles to Per Mar in order to curry favor with it and to impair Cul-

len's business endeavors. It alleges that there was no reason for what the Reillys did other than to harm Cullen because they were angry with Cullen for "forcing" them into bankruptcy and for calling them liars.

The Reillys have responded to these charges by disputing Pleguar's assertions and by contending that § 727(a)(2) does not apply because: (1) the property which was transferred was not the Reillys' property but was property of JHB Security, a non-debtor entity and (2) there is no proof of any fraudulent intent on their part in transferring the intangibles to Per Mar. The Reillys insist that the transfer of intangibles was made in order to provide JHB Security employees with the opportunity for re-employment and also to enable the JHB Security customers with pending contracts to have their contracts completed by Per Mar, which Per Mar agreed to honor. The Reillys deny having received compensation of any kind or any promise for compensation for the transfer of the JHB Security intangibles to Per Mar. Pleguar itself acknowledged that it lacked necessary proof to establish that the Reillys received anything of value for transferring these intangibles.

■■■ The court is unpersuaded by the Reillys' first defense to § 727(a)(2)—that the intangibles were not their property. The court fully recognizes that it is only an individual debtor's interest in a separate entity (and not the assets of the separate non-bankrupt entity) which is property of the individual bankrupt's estate. 2 *Collier on Bankruptcy* ¶ 101.30[3] (15th ed. rev.). At the same time, however, the court also recognizes that the vast value of the assets of JHB Security was comprised of its intangibles transferred to Per Mar. As Pleguar has pointed out, the transfers of these intangibles to Per Mar diminished or eliminated the Reillys' proprietary interest in

JHB Security. In addition, the following testimony by Atty Lanser in response to questioning by Pleguar Atty Levy supports this court's conclusion rejecting this line of defense:

> **Question:** Okay. So you would agree that the individual debtors, Thomas and Mary Reilly, could not give away assets of the business which result in diminishing the value of the business as a whole or possibly eliminating the value of the business as a whole?
>
> **Answer:** I would agree with that.

(July 24, 2009 Tr. p. 76) As a result, the court focuses its attention on the Reillys' second defense asserting Pleguar's failure to prove fraudulent intent.

■■■ Intent to defraud requires actual intent as distinguished from constructive intent. 6 *Collier on Bankruptcy* ¶ 727.02[3][a] (15th ed. rev.). Authority for this statement includes *In re Krehl*, 86 F.3d 737, 743–44 (7th Cir.1996) and *Smiley v. First National Bank of Belleville*, 864 F.2d 562, 566 (7th Cir.1989). *See also In re McClellan v. Cantrell*, 217 F.3d 890 (7th Cir.2000), in which the Seventh Circuit, dealing with § 523(a)(2)(A) for nondischargeability, declared that the fraud exception to dischargeability of debts in bankruptcy does not reach constructive frauds and only applies to actual frauds. In *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir.2002), the court, discussing § 727(a)(2), declared that "the intent to defraud must be actual and cannot be constructive; however, because it is unlikely that the debtor will admit fraud, intent may be established by circumstantial evidence."

In the instant case, the court is not persuaded that the circumstantial evidence presented warrants a finding of actual fraud. While the actions taken by Mr. Reilly in transferring the intangibles to Per Mar occurred shortly after the Reillys had

been informed of the damaging letter which Cullen mailed out to customers and former customers of JHB Security, that was only one factor to be taken into consideration. There are other factors present which override that factor—namely, the Reillys' effort to give the JHB Security employees the opportunity for potential future employment with Per Mar and the Reillys' desire for the pending contracts with the JHB Security customers to be completed. Moreover, as was noted in the earlier portion of this decision, some of these intangibles—more specifically, JHB Security's standard operating procedure and policy manual—had been transferred to Per Mar on March 13, 2007, which was before Cullen had sent out the letter which labeled the Reillys as liars.

Fraudulent intent often depends upon a bankruptcy court's assessment of a debtor's credibility. *Krehl*, 86 F.3d at 743. This court has had the opportunity to observe the Reillys and hear their testimony. Mr. Reilly previously held a responsible position with the Waukesha County Sheriff's Department starting in 1985 and was subsequently promoted to the position of lieutenant in 1994. He left that position in 2003 when he went to work full-time in connection with the business operations of JHB Security.

From the court's observations of both Reillys, it concludes that they were truthful in their testimony and that there was no fraudulent intent on the part of either of the Reillys regarding the transfers of the intangibles to Per Mar.

In view of this finding, it is unnecessary to address the other prerequisite elements of § 727(a)(2). The court is persuaded that the grounds for denial of discharge under § 727(a)(2) have not been established.

## Sec. 727(a)(4)(A)

Denial of discharge has also been asserted by Pleguar based upon § 727(a)(4)(A). The party objecting to discharge on this ground must establish:

1. debtor made a statement under oath,

2. which was false,

3. debtor knew statement was false,

4. the statement was made with fraudulent intent, and

5. statement related materially to the bankruptcy case.

Pleguar has asserted that the Reillys falsified their bankruptcy schedules by omitting from the schedules the intangibles. Omissions from bankruptcy schedules and the Statement of Financial Affairs constitute a false oath within the meaning of § 727(a)(4), provided such omissions were made knowingly and with fraudulent intent. *In re Glenn*, 335 B.R. 703, 707 (Bankr.W.D.Mo.2005); *In re Bostrom*, 286 B.R. 352, 360 (Bankr.N.D.Ill.2002). A review of the Reillys' bankruptcy schedules reveals that Schedule "B" Item 14 (Interests in partnership or joint ventures) disclosed the following:

| Type of Property | Description and Location of Property |
|---|---|
| 14. Interests in partnerships or joint ventures. Itemize. | sole members of JHB Security, LLC, dba R.T.M. Services, no value; debts exceed value of assets (assets voluntarily surrendered to secured party, Layton State Bank) |

Pleguar maintains that this disclosure was insufficient.

The court finds the testimony by Atty Bruce Lanser, who prepared the bankruptcy schedules, to be compelling and concludes that the completed bankruptcy schedules filed did not require a disclosure of the intangibles. The following questions and answers appear in the exchange

between Atty Howell, the Reillys' attorney, and Atty Lanser:

Q. And how would—how did that interest in JHB Security be listed on the bankruptcy schedules of Tom and Mary?

A. We disclosed that they have an ownership interest in that business, as distinguished from the individual assets of the business itself. Meaning, of course, that the assets of the corporate entity are not assets of the bankruptcy estate—of the individual owners of that business.

Q. But what is listed in the Tom and Mary Reilly with respect to that business?

A. Their ownership interests—sole members of JHB LLC.

Q. And where do you put that in the schedules?

A. Well, it's listed on Schedule B and in response to that itemized question that asks about interests in partnership or joint ventures, et cetera.

(July 24, 2009 Tr. p. 59 lines 1–16) Upon further questioning by the Reillys' attorney, Atty Lanser stated he did not recall whether he was informed of this transfer of intangibles at the time he filed the bankruptcy schedules on behalf of the Reillys. Upon additional questioning by the court of Atty Lanser, the following exchange occurred:

Q. Had you been—had you known about the transfer of the intangibles, which is a big part of that business as a going concern—the biggest part—would you have listed it in your Schedule 10?

A. I don't think I would have, Judge.

Q. Well, why not?

A. Because any such transfer would have been done not by Tom and Mary in their individual capacity, but rather as the owners of the company. You know, again, if we're talking about JHB as the debtor, clearly something—to the extent that that in fact was a transfer, that would need to be disclosed.

(July 24, 2009 Tr. p. 86 lines 5–16)

The court is satisfied that there was a full and complete disclosure in the bankruptcy schedules of all assets required to be disclosed by the Reillys and that there was no false oath or fraudulent intent by them within the meaning of § 727(a)(4)(A).

### Sec. 727(a)(4)(C)

 This section, which has also been asserted by Pleguar, does not apply in this case. As Judge Squires stated in *In re Lindemann,* 375 B.R. 450, 471 (Bankr.N.D.Ill.2007):

This section addresses any attempted or actual extortion or bribery in connection with a bankruptcy case. 6 ALAN N. RESNICK AND HENRY J. SOMMER *COLLIER ON BANKRUPTCY* ¶ 727.06, at 727–46 (15th ed. rev.2007). To prevent the debtor's discharge under Sec. 727(a)(4)(C), a creditor must prove two elements: (1) knowledge and a fraudulent intent on the part of the debtor; and (2) receipt of, or an attempt to obtain, or the giving or offering of, money, property, or advantage, or a promise of these, for a purpose, namely, action or forbearance in the case in which the offender is a debtor.

Judge Squires then held that the debtor had not received anything of value for acting or not acting in connection with her bankruptcy case and dismissed the adversary proceeding.

This case does not involve any extortion or bribery. Instead, the record reveals that the Reillys were seeking to reach a resolution with Cullen on behalf of Pleguar which would encompass a forgiveness of the unpaid balance due under the asset purchase agreement with Pleguar in exchange for the return of all assets to Pleg-

uar. Ultimately, that offer was withdrawn when the Reillys were informed by their bankruptcy attorney that to effect such transfer of assets to Pleguar could result in a preference subject to avoidance by a trustee in bankruptcy.

The court concludes that there was never any attempt by the Reillys to subvert the bankruptcy process by initially seeking to return the assets to Pleguar. All the Reillys were seeking was to resolve their dispute with Pleguar and avoid the need for filing bankruptcy.

This court, therefore, concludes that § 727(a)(4)(C) is not a ground for denial of discharge.

### *CONCLUSION*

In the final analysis, what occurred in this case was a breach of the asset purchase agreement—nothing more and nothing less. That is not sufficient to bar a discharge in bankruptcy. The asset purchase agreement did not provide Pleguar with a purchase money security interest in these assets. This left Pleguar in the position of being a general unsecured creditor with a large claim in this bankruptcy case. This adversary proceeding which followed was Pleguar's attempt to have its claim against the Reillys survive their bankruptcy. However, the facts in this case do not warrant a denial of discharge to the Reillys under any of the grounds asserted. Accordingly, this adversary proceeding is dismissed with prejudice, and the Reillys shall be granted a discharge.

The foregoing constitutes this court's findings of fact and conclusions of law under Federal Bankruptcy Rule 7052.

A separate order dismissing this adversary proceeding shall be issued.