In the Matter of Paul JOHNSON, Jawanda Johnson, Debtors.

Colonial Bank, Plaintiff,

v.

Paul Johnson, Jawanda Johnson, Defendants.

Bankruptcy No. 02–81627–JAC–7.
Adversary No. 02–80171–JAC–7.

United States Bankruptcy Court,
N.D. Alabama,
Northern Division.

April 11, 2003.

Gary Wilkinson, Florence, AL, for creditor.

Garland Hall, Chenault, Hammond & Hall, Decatur, AL, for debtors.

Tazewell Shepard, Huntsville, AL, trustee.

## AMENDED MEMORANDUM OPINION[1]

JACK CADDELL, Bankruptcy Judge.

This matter is before the Court on Colonial Bank's complaint to deny the debtors' entire discharge pursuant to 11 U.S.C. § 727(a)(2)(B) on the grounds that Paul Johnson, (hereinafter "Johnson"), removed, transferred, or concealed $18,000.00 in property of the estate with the intent to hinder, delay or defraud his creditors. Colonial contends that Johnson entered into an agreement with Ruby Tuesday, Inc. to lease estate property for $18,000.00 without Court permission; that Johnson signed the lease agreement after the debtors' Chapter 11 case was converted to Chapter 7; that Johnson received $18,000.00 from Ruby Tuesday after the conversion date; and that Johnson concealed the receipt of same with the intent to hinder, delay and defraud his creditors.

The debtor contends that he signed the lease agreement prior to the conversion date, but admits that the received the $18,0000.00 after the Court entered the order converting his case. The debtor asserts that he spent the $18,000.00 to pay bills and denies that he spent the money with the intent to hinder, delay or defraud his creditors.

Colonial further seeks a judgment determining that the debtors' debt to Colonial is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) for willful and malicious conversion and pursuant to 11 U.S.C. § 523(a)(4) for defalcation while acting in a fiduciary capacity. Colonial contends that the debtors, while acting as debtors-in-possession in the Chapter 11 case, willfully and maliciously converted Colonial's cash collateral by failing to make two adequate protection payments totaling $4,000.00 and that the failure to make the adequate protection payments constitutes an act of defalcation while acting in a fiduciary capacity.

On June 12, 1996, the Johnsons executed and delivered a promissory note to Colonial Bank secured by real estate commonly referred to as the East Point Shopping Center which is located in Florence, Alabama. The balance due on the note as of February 24, 2003 was $129,960.65. This amount is the balance due after Colonial credited the sum of $1,440,000.00 to the note. Colonial purchased the shopping center for $1,440,000.00 at the foreclosure sale.

## I. FINDINGS OF FACT

On April 9, 2002, Paul and Jawanda Johnson filed bankruptcy under Chapter 11 of the Bankruptcy Code. Paul Johnson has been a real estate developer for ap-

---

**1.** This opinion is being amended to include one additional paragraph on page 2 which begins "On June 12, 1996". The judgment entered on April 3, 2003 is not amended or altered by this amendment to the memorandum opinion.

proximately thirty years. He has developed various real estate projects in Florence, Alabama during this time including the following projects: Ruby Tuesday, Wal-mart Super Center, Sonic, Comfort Inn, Advanced Auto Parts, and Logans Roadhouse.

Johnson also owns and leases commercial sites including the East Point Shopping Center on which Colonial Bank has a mortgage which contains an assignment of rents clause. The rent roll on the shopping center is approximately $5,000.00. On April 23, 2002, Colonial Bank filed a motion for adequate protection or, alternatively, to prohibit the use of its cash collateral. Prior to the hearing on the motion, the parties settled the matter and entered into a consent order pursuant to which the debtors agreed to pay Colonial $2,000.00 per month until they obtained a confirmed plan. The first payment was due June 3, 2002. Rather than having the debtors make the payments directly to Colonial, Colonial's attorney required the debtors to submit the payments to debtors' attorney who was to then forward same to Colonial's attorney.

On May 31, 2002, Johnson sent the June payment to his attorney. Unfortunately, debtors' counsel did not forward the payment to Colonial until July 1, 2002. On June 18, 2002, Colonial filed a motion to lift the stay on the shopping center because it had not received the June payment as required by the consent order.

On June 28, 2002, Johnson sent check # 1023 to his attorney for the July 2002 adequate protection payment. However, when Johnson learned that Colonial had filed a motion to lift the stay, he instructed his attorney to keep check # 1023 for payment of attorney fees. The debtors did not tender further payments to Colonial as required by the adequate protection order. The Court entered an order on July 11, 2002 by agreement of the parties lifting the stay in favor of Colonial.

At trial, Johnson admitted on examination that he did not comply with the adequate protection order because he felt that Colonial's attorney, Gary Wilkinson, Esq., had lied to him by filing the motion to lift stay on June 18, 2002. Johnson had apparently entered into the consent order on adequate protection payments with the understanding that Colonial would not "go after him" if he agreed to pay adequate protection payments. If Johnson's attorney had only forwarded the June payment to the bank timely, the adequate protection agreement would not have gone into default. With regard to the July payment, Johnson repeatedly testified that he instructed his attorney to keep Colonial's July adequate protection payment and apply same to attorney fees which had not yet been paid because Johnson believed Mr. Wilkinson had lied to him by filing the motion for relief from stay.

Subsequently, on July 22, 2002, the bankruptcy administrator filed a motion to dismiss or convert debtors' case for failure to file operating reports. At the hearing, the Court ruled that the debtors' case was due to be converted in light of their failure to file operating reports during the four months the case had been pending. On August 22, 2002, the Court entered an order converting the case to Chapter 7 and appointed Tazewell Shepard, Esq. as Chapter 7 trustee.

As of August 22, 2002, the debtors were no longer debtors-in-possession and were no longer entitled to operate as such. This point was made clear to Johnson at the hearing on the bankruptcy administrators' motion to convert when counsel for Colonial, Gary Wilkinson, Esq., made the following comment to the Court on the record:

May I ask the Court to inform Mr. Johnson that as of about four minutes ago the trustee became the owner of all these assets and that any use, possession, or any other contact with any of these assets would be contrary to the trustee's position. And, I respectfully submit that is in all likelihood a very necessary admonition to make.

Although, Johnson testified that he did not remember Mr. Wilkinson's statement, Johnson was present at the August 22, 2002 hearing. Johnson admits that he was aware that the Court granted the administrator's motion to convert at the August 22, 2002 hearing. Nevertheless, Johnson continued to operate his business as if his case had not been converted and as if a trustee had not been appointed to administer his assets.

Beginning in late July of 2002, prior to conversion, Johnson began negotiating with Ruby Tuesday, Inc. for the lease of a small strip of land located next to the restaurant which Ruby Tuesday wanted to use as an auxiliary or overflow parking lot. During the negotiations with Ruby Tuesday, Johnson never informed Ruby Tuesday representatives that he was in bankruptcy.

Johnson contends that he signed the lease agreement on August 16, 2002, prior to conversion on August 22, 2092, and, indeed, the debtor's signature on the lease is dated and notarized August 16, 2002. However, the evidence shows and the Court finds that the lease had not been prepared on August 16, 2002 when Johnson purportedly signed the document.

At trial, Colonial submitted the deposition testimony of Walter Cole, Jr., Vice President of Legal Real Estate for Ruby Tuesday into evidence. Mr. Cole drafted the lease agreement which was not finalized and ready for Johnson's signature until August 26, 2002 as shown by the following exchange of e-mails between various Ruby Tuesday employees who were involved in preparing the parking lot lease:

1. In the following email dated August 21, 2002 from Walter Cole to Dan Bettis, the Regional Development Director of Ruby Tuesday, Cole explained that the lease had not been completed as of the date of the e-mail:

We should have the parking lot lease late tomorrow. Sue was out today. On what date do you want the lease to start—that is the date we start using and the date we start paying rent. If it is not the first day of a month we can prorate the monthly rent ($1,500). Thanks.

2. Bettis responded by e-mail dated August 21, 2002 as follows:

Probably 9/1. The landlord wants us to make the rent payment in one up-front lump sum, since he has done the grading, curb, cuts, and rocking. I guess that's reasonable given what he's out of pocket.

3. On August 23, 2002, Cole's legal assistant sent the following e-mail to Bettis:

Dan—Below is the revised Parking Lot Lease Agreement for the subject location. I have revised the Agreement to change the Landlord name from Paul Johnson to Johnson Properties. Since I am e-mailing this to you, Exhibit A and Exhibit B are not attached. If you need to view these exhibits, please let me know and I will fax them to you.

It is my understanding that you will see that Paul Johnson receives the Agreement for his review. Please let me know if I may help further.

4. In a e-mail from Bettis to Cole dated August 26, 2002, Bettis requested that the lease be revised. The e-mail reads as follows:

I need two revisions to the Florence parking lot lease we just did.

1) There are two dates in the lease (I think both are 9/1). Please change them both to 8/16/02.

2) Add a 5% rent increase on each of the two 1–year options.

If you would make those changes, please email me a copy and fax to Paul Johnson. I told him we'd send the rent check as soon as we got a signed copy back.

Based upon this exchange of e-mails, it is clear that the lease agreement could not have been signed by Johnson on August 16, 2002 as the debtor would have this Court believe. Walter Cole prepared and executed the revised parking lot lease on August 26, 2002 and then forwarded a copy of same by Federal Express—2nd Day Delivery to Johnson for signature as explained in the following facsimile cover sheet from Cole to Johnson dated August 26, 2002:

> Following is the *revised* Parking Lot Lease Agreement between you and Ruby Tuesday, Inc. The revisions are in paragraph 1 where the term was changed to commencing on August 16, 2002.... The Agreement has been signed by Ruby Tuesday. Two (2) counterparts of the Agreement will be sent to you today, via Federal Express—2nd Day Delivery, **for your signature,** and then the return of one (1) fully executed counterpart to me. Thank you. (Emphasis added).

On August 27, 2002, Johnson faxed a signed copy of the lease agreement back to Walter Cole. Mr. Cole's signature is dated and notarized August 26, 2002, the day he executed and sent the agreement to Johnson for signature. Mr. Johnson's signature is dated and notarized August 16,

2002. When Mr. Cole was asked by Colonial's counsel at his deposition whether Johnson could have signed the lease on August 16, 2002, he said no, that would have been impossible.[2]

Johnson does not dispute that he received $18,000.00 from Ruby Tuesday by check dated August 26, 2002 sometime on or immediately after August 26, 2002. At trial, Johnson first testified that he deposited the $18,000.00 check into his South-Trust checking account which had been set up as a debtor-in-possession account in the Chapter 11 case. However, upon further examination by Colonial and after reviewing copies of the bank statement on that account, Johnson rescinded this testimony and after repeated questioning finally admitted that he made a split deposit on August 28, 2002 into the account of Royal Flush, Inc., an entity which is not in bankruptcy, by depositing $12,000.00 into the account and pocketing the remaining $6,000.00.

Johnson owns or may own some interest in Royal Flush, Inc. Although at one time he owed 100% of the stock in same, there was introduced into evidence a bill of sale signed by him of all his interest in the company to an entity by the name of Twickenham Commercial Lending, Incorporated. It may be that the sale of stock was given only as security for a debt owed by Johnson to Twickenham, but in any event, the $18,0000.00 was removed from Johnson's bankruptcy estate—$12,000.00 into the Royal Flush, Inc. account and $6,000.00 into Johnson's pocket.

The debtor testified that he used the $12,000.00 deposited in the Royal Flush account and the $6,000.00 which he took in cash and used same to simply pay past due bills. Johnson further testified that he used the money to pay for various bounced

**2.** Deposition of Walter G. Cole, Jr., page 13, lines 14–20.

checks in order to avoid being arrested for NSF checks. When questioned at trial as to why he deposited the estate property into the Royal Flush account and not his debtor-in-possession account, Johnson stated that he was afraid that the debtor-in-possession account would be frozen and that he would not be able to use the money to pay bills.

## II. CONCLUSIONS OF LAW

■ To effectuate the fresh start policy, objections to discharge are strictly construed against an objecting creditor and liberally in favor of the debtor.[3] Discharge is only available, however, to honest debtors.[4] The burden of proof is on the plaintiff objecting to the debtor's discharge to prove the elements of a § 727 complaint by a preponderance of the evidence.[5] In this case, Colonial asserts that Johnson's conduct meets the requirements for denial of discharge under § 727(a)(2)(B) pursuant to which the court shall grant the debtor a discharge unless:

(2) the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be

transferred, removed, destroyed, mutilated, or concealed—

(B) property of the estate, after the date of the filing of the petition[.]

■ To establish a prima facie case under § 727(a)(2)(B), Colonial must prove the following elements:

1) there was a concealment;
2) after the filing date of the petition;
3) of property of the estate;
4) by the debtor with the intent at the time of the concealment to hinder, delay or defraud his creditors.[6]

■ Colonial has satisfied each of these elements. Johnson concealed the receipt of property of the estate, $18,000.00, from the trustee and his creditors by depositing same into the checking account of an entity which is not in bankruptcy and by using the funds to pay personal expenses and bills. Although Johnson began negotiating the terms of the lease agreement with Ruby Tuesday while he was a debtor-in-possession, the overwhelming evidence proves that the debtor continued to negotiate the terms of the lease after August 22, 2002 and that Johnson went out of his way to back date the lease agreement to make it appear that he entered into same prior to conversion.[7] Johnson took these ex-

---

3. *Henkel v. Green (In re Green)*, 268 B.R. 628, 645 (Bankr.M.D.Fla.2001); *Royer v. Smith (In re Smith)*, 278 B.R. 253, 257 (Bankr.M.D.Ga. 2001).

4. *Jensen v. Groff (In re Groff)*, 216 B.R. 883, 886 (Bankr.M.D.Fla.1998).

5. *Id.; Henkel v. Green (In re Green)*, 268 B.R. 628, 645 (Bankr.M.D.Fla.2001).

6. *In re Smith*, 278 B.R. at 257.

7. The debtor, several times while testifying, tried to make much of the fact that the deal with Ruby Tuesday was entered into before the conversion and, therefore, he "was the trustee" and entitled to keep and use the money in the ordinary course of business of

the Chapter 11. There are several problems with this argument. One, even if the deal had been entered into and finalized before the conversion, the money was not received until after the conversion and was, thus, Chapter 7 property. Second, even as debtor-in-possession, the DIP should have told the purchaser that he was in bankruptcy and probably should have obtained court approval to enter into a three year lease. The Court believes that this was not an ordinary course transaction even though the debtor was a real estate developer. Finally, even had the deal been entered into and the money received before the conversion, Johnson would have had a fiduciary duty to place the funds into the debtor-in-possession account and report same on his operating reports.

traordinary actions despite of, or perhaps, because of Mr. Wilkinson's admonition in Court on August 22, 2002 that Johnson was no longer the owner of the subject assets and that any use, possession or contact with same would be contrary to the Chapter 7 trustee's position. At trial, Johnson admitted that he placed the $18,000.00 into the account of an entity which is not in bankruptcy because he did not know what the Chapter 7 trustee would do with the funds. He was afraid that the debtor-in-possession account would be frozen and he needed the money to pay bills to keep himself out of jail.

█ The intent element under § 727(a)(2) must be established by proving that the debtor had an actual fraudulent intent to defraud.[8] It is often stated that a debtor's actual fraudulent intent can be proven by circumstantial evidence because the debtor is unlikely to admit fraudulent intent.[9] In this case, Johnson came very close to admitting actual fraudulent intent when he testified that he deposited two-thirds of the $18,000.00 check into the Royal Flush account rather than depositing the funds into his debtor-in-possession account because he was afraid the account would be frozen by the Chapter 7 trustee. Johnson repeatedly stated that he needed the money to pay bills which he admitted included NSF checks. Johnson used an undisclosed amount of the $18,000.00 to pay these NSF checks to keep himself out of jail by using property of the estate.

Based upon the forgoing, the Court finds that Paul Johnson's discharge is due to be denied under § 727(a)(2)(B) of the Code for debtor's transfer/concealment of property of the estate after the date of the filing of the petition whereby:

1. Johnson continued to negotiate the terms of the lease agreement with Ruby Tuesday after the conversion of his case to Chapter 7 and requested that one years lease payment be made in one lump sum at the front end of the lease;

2. Johnson back dated the lease agreement with Ruby Tuesday to make it appear that same was entered into prior to the conversion of his case;

3. Johnson received $18,000.00 from the lease of estate property without notifying his Chapter 7 trustee;

4. Johnson concealed/transferred the $18,000.00 check by depositing $12,000.00 into an entity which is not in bankruptcy and pocketed $6,000.00 in cash; and

5. Johnson used the estate property to pay various personal bills including NSF checks to avoid being arrested.

The Court makes this finding only with regard to Paul Johnson and finds that his discharge is due to be denied in its entirety under § 727(a)(2)(B). The debtor shall be ordered to return the $18,000.00 to the Chapter 7 trustee.

█ This finding does not apply to Jawanda Johnson as there was no evidence presented that Mrs. Johnson was in any way involved in the transfer or concealment of the subject funds. This case shall be forwarded to the U.S. Attorney's office for review to determine whether criminal charges should be brought against Mr. Johnson for bankruptcy fraud.

█ With regard to Colonial's claim that the entire debt owed by Johnson

---

8. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 306 (11th Cir.1994); *Village of San Jose v. McWilliams (In re McWilliams)*, 284 F.3d 785, 790 (7th Cir.2002); *In re Smith*, 278 B.R. at 257.

9. *In re McWilliams*, 284 F.3d at 790; *In re Green*, 268 B.R. 628, 647 (Bankr.M.D.Fla. 2001).

should be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(4)[10] and (6), the Court finds that $2,000.00 of the debt is nondischargeable pursuant to § 523(a)(6) for willful and malicious conversion.[11] The term malicious for purposes of denying the discharge of a debt means a wrongful act done consciously and knowingly in the absence of just cause or excuse, while the term willful means intentional or deliberate. *Burgess v. Martin (In re Martin)*, 171 B.R. 395, 397 (Bankr. N.D.Ala.1994). "Willful and malicious injury includes willful and malicious conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights." *Thomas Shelton v. Steering Federal Credit Union*, 191 B.R. 893, 895 (N.D.Ala.1995)(citing *In re Wolfson*, 56 F.3d 52, 54 (11th Cir.1995)). Thus, conversion of another's property, without his knowledge or consent, done intentionally and without justification or excuse, is a willful and malicious injury within the meaning of section 523(a)(6).

■ On June 28, 2002, Johnson sent a $2,000.00 check to his attorney for the July adequate protection payment. When Johnson discovered that Colonial had filed a motion to lift the stay on the East Point Shopping center, Johnson intentionally and deliberately made the decision to convert Colonial's cash collateral by instead using the money to pay his attorney. Johnson knew that the $2,000.00 was Colonial's cash collateral. When questioned at trial

as to whether he failed to make the July adequate protection payment because he did not have sufficient funds, Johnson stated that the first reason he did not pay was because he believed Wilkinson had lied to him by filing the motion to lift the stay. Johnson obviously had the money to pay the July payment, but, instead, he made the intentional decision to use and converted same to pay his attorney because he was mad at Colonial and Colonial's attorney. Hence, the Court finds that the July adequate protection payment in the amount of $2,000.00 is nondischargeable pursuant to § 523(a)(6).

■ Furthermore, the Court finds that Colonial is entitled to a super priority administrative expense claim in the amount of $4,000.00. Section 507(b) reads as follows:

(b) If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) if this title, **then such creditor's claim under such subsection shall have priority over every other claim allowable**

---

**10.** The Court has previously ruled that § 523(a)(4) is not applicable.

**11.** Although Colonial did not assert a claim under § 523(a)(6), the Court finds that it is appropriate to grant relief where the facts and law so provide. In *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, (Bankr.S.D.N.Y. 2002), the bankruptcy court noted that the critical issue in deciding whether the plead-

ings should be conformed to the proof at trial is whether prejudice will result to the defendant. In this case, the Court raised the issue of § 523(a)(6) at the hearing on motion for summary judgment and again at trial. The defendant neither objected at the summary judgment hearing, nor at trial, to the Court's consideration of § 523(a)(6). Hence, the Court finds no prejudice.

**under such subsection.** (Emphasis added)

Pursuant to 11 U.S.C. § 507(b), Colonial's administrative expense claim shall be paid ahead of every other administrative expense claim, including attorney fees.[12]

**12.** In a recent case, *In re Specker Motor Sales Co.,* 289 B.R. 870 (Bankr.W.D.Mich.2003), the bankruptcy court required an attorney who had represented a Chapter 11 prior to the conversion of its case to one under Chapter 7 to disgorge interim fees that had been paid during the Chapter 11 case. The court required a pro rata distribution be made to all Chapter 11 administrative claimants pursuant to 11 U.S.C. § 726(b). Section § 507(b) goes one step further and places adequate protection payments ahead of every other allowable administrative claimant without regard to pro ration. They are paid even before § 507(a)(1) claims are reached. It may be necessary for debtors' counsel to disgorge the $2,000.00 payment that had been earmarked as Colonial's adequate protection payment upon settlement of the estate.