**In re Josh S. UNGER, Debtor.**

**Petland, Inc., Plaintiff,**

v.

**Josh S. Unger, Defendant.**

**Bankruptcy No. 8:04BK3625PMG.**

**Adversary No. 8:04–ap–383–PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Sept. 21, 2005.

---

Donald R. Kirk, Esquire, Fowler, White, Boggs, Banker, P.A., Tampa, FL, for Plaintiff.

G. Donald Golden, Esquire, G. Donald Golden, P.A., Brandon, FL, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing to consider the Complaint Objecting to the Debtor's Discharge filed by the Plaintiff, Petland, Inc.

In the Complaint, the Plaintiff asserts that the discharge of the Debtor, Josh S. Unger, should be denied pursuant to § 727(a)(4) of the Bankruptcy Code, because the Debtor "knowingly and fraudulently took a false oath in this case" by omitting certain valuable assets from his bankruptcy schedules, and also by undervaluing and mischaracterizing his ownership interest in certain other assets.

In response, the Debtor acknowledges that various inaccuracies appeared in the Schedules. The Debtor contends, however, that he did not intend to defraud his creditors when he signed the Schedules, and that the errors can be explained by the underlying circumstances.

### Background

On May 30, 2001, the Plaintiff, as franchisor, and the Debtor, as franchisee, entered into a Franchise Agreement pursuant to which the Plaintiff granted the Debtor a license to use its System and Marks, as defined in the Agreement, to operate a retail pet store at a "location to be determined." (Plaintiff's Proof of Claim No. 1, Attachment 2).

On February 12, 2002, the Plaintiff and the Debtor entered into a Purchase Agreement pursuant to which the Plaintiff sold the Debtor certain furniture, fixtures, equipment, leasehold improvements, and services for use in connection with the Debtor's "Petland retail outlet located at 7699 Waters Avenue, Tampa, Florida." The total purchase price was $563,373.00. (Plaintiff's Proof of Claim No. 1, Attachment 1).

On May 20, 2002, the Debtor issued a handwritten invoice to P & B Pet Stores for the sum of $390,188.00, purportedly in connection with his sale to P & B Pet Stores of the fixtures and equipment described in the invoice. On the same date, the Debtor, as president of P & B Pet Stores, signed a handwritten Promissory Note payable to the Debtor in the amount of $390,188.00. (Plaintiff's Exhibit 18).

On June 10, 2003, the Debtor filed a petition under Chapter 13 of the Bankruptcy Code, which was assigned Case No. 03–11875. On his schedule of assets filed in Case No. 03–11875, the Debtor listed the following items of personal property: household goods valued at $2,500.00, clothing valued at $500.00, jewelry valued at $500.00, 1,000 shares of Petland valued at $1,000.00, a 1999 Range Rover valued at $6,000.00, and a 2002 Porsche 911 valued at $60,000.00. SunTrust Bank was listed as a secured creditor holding a lien on the Porsche in the amount of $45,000.00. The Plaintiff was not listed as either a secured creditor or an unsecured creditor in the case.

Case No. 03–11875 was dismissed on November 18, 2003.

On February 25, 2004, the Debtor filed a second petition under Chapter 13 of the Bankruptcy Code, which was assigned

Case No. 04–3625. On his schedule of assets filed in Case No. 04–3625, the Debtor listed the following items of personal property: household goods valued at $2,500.00, clothing valued at $500.00, jewelry and a watch valued at $500.00, and a 2002 Porsche 911 valued at $60,000.00. SunTrust Bank was again listed as a secured creditor holding a lien on the Porsche in the amount of $45,000.00. The Plaintiff was listed as an unsecured creditor with a claim in the amount of $150,000.00. On his Schedule of Income and Expenses, the Debtor stated that he was the owner of a Petland, and earned gross income in the amount of $5,000.00 per month.

The Debtor subsequently filed a Notice of Voluntary Conversion, and the Chapter 13 case was converted to a case under Chapter 7 of the Bankruptcy Code on April 20, 2004.

On May 4, 2004, approximately two weeks after the conversion, the Debtor filed an Amended Schedule of personal property. The Amendment affected two categories of property. First, the value of the Porsche was reduced to $41,000.00. Second, various items of pet store equipment were added at an unknown value. On the same date, May 4, 2004, the Debtor also filed an Amendment to Schedule F to add Realty Income Corp. as an unsecured creditor.

On June 16, 2004, the Plaintiff commenced this adversary proceeding by filing a Complaint Objecting to the Debtor's Discharge. Generally, the Plaintiff asserted that the Debtor's discharge should be denied pursuant to § 727(a)(4) of the Bankruptcy Code because he omitted valuable assets from his schedules, and also because he undervalued and mischaracterized his ownership interest in certain other assets.

On August 3, 2004, approximately one and one-half months after the commencement of this action, the Debtor filed five more Amendments to his Schedules and Statement of Financial Affairs in the main case.

First, the Debtor amended his Schedule I to state that he is unemployed and has no income. Second, the Debtor amended his Statement of Financial Affairs to list the above-captioned adversary proceeding, and also a prepetition state court action commenced by the Plaintiff, as lawsuits "to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case." Third, the Debtor amended his Schedule J to reduce his current expenses from $4,250.00 per month to $4,100.00 per month. Fourth, the Debtor filed an Amendment to Schedule B to reflect the appraised value of his personal property as follows: household goods valued at $3,485.00, clothing valued at $240.00, jewelry valued at $375.00, and the Porsche 911 valued at $51,000.00. Finally, the Debtor filed an Amendment to Schedule C to claim his household goods as exempt to the extent of $1,000.00.

### Discussion

■ Generally, "section 727(a) of the Bankruptcy Code may be utilized to deny a discharge to dishonest debtors, however unfortunate." *In re Matus*, 303 B.R. 660, 670 (Bankr.N.D.Ga.2004)(quoted in *In re Moeritz*, 317 B.R. 177, 182 (Bankr. M.D.Fla.2004)).

### I. Section 727(a)(4)

#### A. The statute

■ In its Complaint, the Plaintiff alleges that the Debtor's discharge should be denied pursuant to § 727(a)(4) of the Bankruptcy Code. Section 727(a)(4)(A) provides:

**11 USC § 727. Discharge**

(a) The court shall grant the debtor a discharge, unless—

.　　.　　.　　.　　.

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). In order to deny a debtor's discharge under § 727(a)(4)(A), the Court must find that the debtor "knowingly made a false oath that was both fraudulent and material." *In re Moeritz*, 317 B.R. at 183 (quoting *In re Bratcher*, 289 B.R. 205, 218 (Bankr. M.D.Fla.2003)).

■ The "[k]nowing failure to disclose information on schedules violates § 727(a)(4)(A) and empowers the court to deny discharge under that section." *In re Moeritz*, 317 B.R. at 183(quoting *In re Prevatt*, 261 B.R. 54, 59 (Bankr.M.D.Fla. 2000)).

■ The false oath must have been made with actual fraudulent intent. In other words, for a debtor's discharge to be denied under § 727(a)(4)(A), the Court must find that the Debtor "acted with actual intent, requiring a showing of extrinsic evidence suggesting that fraud exists." *In re Moeritz*, 317 B.R. at 183(quoting *In re Davis*, 297 B.R. 555, 556 (Bankr. S.D.Ill.2003)). The actual intent mandated by the section "requires actual subjective intent, not objective or constructive intent." *In re Moeritz*, 317 B.R. at 183(quoting *In re Downey*, 242 B.R. 5, 13 (Bankr.D.Idaho 1999)).

**B. The omitted assets**

In this case, the Plaintiff contends that the Debtor made false oaths pertaining to the following assets:

**1. Bank accounts.**

The Debtor stated on his schedules that he did not own any checking, savings, or other financial accounts.

A. *Bank of America.* On February 24, 2004, one day before the Debtor filed his bankruptcy petition, the Bank of America answered a Writ of Garnishment served by the Plaintiff, and disclosed the existence of a checking account in the joint names of the Debtor and Mary E. Armstrong. The account contained the sum of $1,307.02. (Plaintiff's Exhibit 17).

The Debtor testified that the funds in the account belonged to his girlfriend, and that they had separated prior to the filing of his bankruptcy case. The Debtor further testified that he knew that his "social security number and information" were on the account, but didn't know that his name was on the account. (Transcript, p. 84).

B. *Wachovia Bank.* A corporation known as OPM, Inc. owned three accounts at Wachovia Bank: (1) Business Checking Account No. 2000016875146 owned by OPM, Inc. d/b/a Puppy Cuts; (2) Business Checking Account No. 2000016875133, an Internet account, owned by OPM, Inc.; and (3) Business Checking Account No. 2000026278979, owned by OPM, Inc. (Plaintiff's Exhibit 21). The evidence is in disarray regarding the corporate structure, business purpose, and ownership of OPM, Inc., although the Debtor testified that the corporation belonged either to his mother or his sister. (Transcript, pp. 23–30).

The OPM account statements that were admitted into evidence relate only to post-petition periods and transactions. Nevertheless, it appears that the Debtor had a beneficial interest, at a minimum, in at least one of the accounts on the date that he filed his petition. The Debtor testified, for example, that he is a "signer," and

possibly the sole "signer," on Account No. 2000016875133. (Transcript, pp. 23, 28, 34). The postpetition account statements were mailed to the address at which the Debtor lived alone from the date of filing through October of 2004. (Transcript, pp. 21, 30, 34).

The Debtor testified that the money was initially deposited into the account so that he could pay his bills, that the money was deposited for his use, and that he had access to the account to run his business. (Transcript, p. 42–44). The Debtor further testified:

> At the time that I opened the accounts, I did not have the credit required to open bank accounts. I then asked if my mother could open bank accounts and *fund this business,* which she did. And then *I started the business.*

(Transcript, p. 47)(Emphasis supplied). The Debtor entered the Franchise Agreement with the Plaintiff in 2001, and claimed to be the owner of a Petland at the time that he filed his bankruptcy petition. (See Debtor's original Schedule I). Since the Debtor was operating his pet store "business" both before and after the commencement of his bankruptcy case, and since the OPM account was created for the specific purpose of funding the "business," it is logical to conclude that the Debtor had a beneficial interest in the bank account as of the date of the petition.

### 2. 1998 Range Rover

The parties stipulated that "as of the petition date, and as of the date of this hearing, the Debtor was the sole registered owner of a green 1998 Range Rover." (Transcript, p. 7). The Range Rover was not listed on the Debtor's schedule of assets in this case. A 1999 Range Rover, however, was listed in the Debtor's sched-

ules in Case No. 03–11875 filed on June 10, 2003.

The Debtor contends that he had transferred the Range Rover to P & B Pet Stores on an undetermined date prior to August of 2003. The Debtor is the sole owner of P & B Pet Stores. (Transcript, p. 37). The Debtor further testified that P & B Pet Stores subsequently transferred the Range Rover to Nick Peters, an employee of the Debtor's pet store business, in August of 2003 as payment for Peters' services. (Transcript, p. 38). The Debtor acknowledges that title to the vehicle was never transferred either from himself to P & B Pet Stores, or from P & B Pet Stores to Nick Peters. (Transcript, pp. 38, 39–40). No documentation was admitted into evidence that reflects either of the transfers, and the transfer from the Debtor to P & B Pet Stores was not disclosed on the Debtor's Statement of Financial Affairs.

### 3. 1999 Yamaha boat and trailer

The parties stipulated that as of the petition date, the Debtor was a registered owner of a 1999 Yamaha Motor Corp. open motor boat and a 1999 boat trailer. (Transcript, p. 7). The boat and trailer were not listed on the Debtor's schedules.

The Debtor testified that the boat experienced severe engine damage in late 2001, and that he took the boat to the dealer to obtain an estimate of the repair cost. According to the Debtor, however, he could not afford the repair cost quoted by the dealer, and therefore left the boat at the dealership rather than retrieve it. The dealer subsequently informed the Debtor that storage fees were accruing for the boat. Consequently, the Debtor testified that he believed that the boat was encumbered by a lien for the storage fees, and that title had already been transferred to satisfy the lien by the time that his bank-

ruptcy petition was filed. (Transcript, pp. 82–83).

The Debtor did not testify that he made any inquiry as to the status of the boat when he prepared his bankruptcy schedules.

On April 4, 2005, the Trustee filed an Amended Notice and Report of Intention to Sell the boat and trailer to Chris Mullinex's Recovery for the sum of $500.00. (Main case, Doc. 74).

### 4. Debt owed to the Debtor from P & B Pet Stores

The Debtor stated on his schedules that he owned no accounts receivable, and that no liquidated or unliquidated debts were owed to him at the time of filing.

The Debtor acknowledges, however, that he sold the fixtures associated with the pet store to P & B Pet Stores on May 20, 2002. The Debtor also acknowledges that, on the same date, he signed a Promissory Note as president of P & B Pet Stores, payable to himself individually, in the amount of $390,188.00. (Plaintiff's Exhibit 18). P & B Pet Stores had not paid any portion of the indebtedness as of the date of the Debtor's bankruptcy petition. (Transcript, p. 48).

The Debtor offered conflicting testimony regarding his failure to schedule the Promissory Note. The Debtor stated, for example, that he did not consider the Note to constitute a potential asset of the estate, because P & B Pet Stores was "defunct" and no longer operating as of the petition date. (Transcript, p. 86).

The Debtor also testified, however, that P & B Pet Stores did not discontinue its operations until the fall of 2004, *after* the filing of the petition in February of 2004. (Transcript, p. 86). Further, on his original Schedule I that was filed with the petition on February 25, 2004, the Debtor listed his occupation as the owner of a "Petland," and stated that the gross income earned from his occupation equaled $5,000.00 per month. According to a pleading in a related Chapter 11 case commenced for the business, "Petland" was a trade name for P & B Pet Stores, Inc. (Case No. 03–5082, Doc. 30). Consequently, it appears that P & B Pet Stores, the obligor on the Promissory Note, was not "defunct" on the date that the Debtor filed his bankruptcy petition.

The Debtor's explanation for his failure to list the Promissory Note on his schedules is not consistent either with the balance of his testimony, or with other representations made by him in other bankruptcy cases.

### 5. Artwork

The Debtor stated on his schedules that he owned no art objects or collectibles.

In connection with his divorce proceeding in 2000, however, the Debtor stated that he owned three slates valued at $140,000.00 and rubbings valued at $100,000.00. (Transcript, pp. 69, 71). Similarly, in her Financial Affidavit submitted in connection with the divorce, the Debtor's former spouse listed slates valued at $150,000.00 and rubbings valued at $100,000.00. (Plaintiff's Exhibit 11). The Debtor testified that the slates were created by a well-known artist named Frank Eliscu, the designer of the Heisman Trophy, whom the Debtor refers to as his grandfather. (Transcript, pp. 73–74).

The Debtor testified that he wanted the artwork back following the divorce (Transcript, p. 72). The Marital and Property Settlement Agreement signed by the Debtor and his former wife in September and October of 2000 expressly provides for the return of the artwork to the Debtor:

11. Husband's Grandfather's Art Objects:

Within twenty (20) days from the date of this Agreement, the Wife shall return to the Husband the art objects the Husband acquired from his grandfather, and the Husband shall own the same in full free from any claim by the Wife. The Wife shall return the above mentioned art objects in the same condition as they existed prior to the time said art objects were removed from the parties' residence.

(Plaintiff's Exhibit 10).

On a Credit Application submitted to Century Bank on May 8, 2001, the Debtor represented that he owned "miscellaneous furniture, art, and property" with a total value of $140,000.00. (Plaintiff's Exhibit 1).

The artwork was not disclosed on the Debtor's schedules. Admittedly, more than two years elapsed between the submission of the Credit Application to Century Bank and the filing of the bankruptcy petition, but the Debtor's explanation for the omission of the artwork from his schedules is not credible. The Debtor testified, for example, that he "returned the slates and rubbings" to his mother after his divorce. He also testified that he doesn't know where the artwork is. (Transcript, pp. 71–72).

In his divorce proceeding and also on a Credit Application, the Debtor stated that the artwork was worth more than $140,000.00. According to the Debtor's own testimony, the artwork not only was created by a well-known artist, but also held special family value to the Debtor. The artwork was located in the Debtor's residence prior to his divorce, and was expressly awarded to the Debtor in the Marital and Property Settlement Agreement signed in connection with the divorce. It is implausible that the Debtor had either disposed of the artwork, or did not know where it was, as of the date that he filed his bankruptcy petition.

### 6. Computer equipment

The Debtor did not list any personal computer equipment either on his original schedules filed in February of 2004, or on his amended schedules filed on May 4, 2004, or August 3, 2004. (Transcript, p. 53).

During the course of this proceeding, however, the Debtor completed a handwritten list of computer equipment owned by him. (Transcript, pp. 52–53; Plaintiff's Exhibit 9). As of the date of the trial, the computer was in the possession of the Chapter 7 Trustee for evaluation. (Transcript, p. 88).

### C. Fraudulent intent

As set forth above, to prevail under § 727(a)(4)(A), a plaintiff must show that the debtor made a material false oath, and that the false oath was made with actual fraudulent intent. In this case, the Debtor contends that he did not intend to defraud his creditors by failing to disclose the assets described above on his bankruptcy schedules.

■■ A party objecting to a discharge under § 727(a)(4), however, may show the debtor's fraudulent intent either by establishing that the debtor engaged in a pattern of concealment, or that the debtor possessed a reckless indifference to the truth. *In re Eigsti*, 323 B.R. 778, 784 (Bankr.M.D.Fla.2005). Further, multiple inaccuracies in the debtor's schedules may cumulatively evidence a "cavalier disregard for the truth." *In re Eigsti*, 323 B.R. at 785 (quoting *In re Leffingwell*, 279 B.R. 328, 351 (Bankr.M.D.Fla.2002))(quoting from *In re Hatton*, 204 B.R. 477, 484 (E.D.Va.1997)).

■ Under § 727(a)(4), "the debtor has an obligation to disclose the existence of all assets, even if they are worthless or unavailable. (Citation omitted.) Debtors cannot escape disclosure under this subsection by claiming that assets omitted are worthless; it is up to the creditors to decide for themselves what assets will be of benefit to them and which will not." *In re Ingersoll*, 124 B.R. 116, 122 (M.D.Fla. 1991).

■ In this case, the Court finds that the Debtor made material false oaths on his bankruptcy schedules, with fraudulent intent, and that the Debtor's discharge should be denied pursuant to § 727(a)(4) of the Bankruptcy Code.

This is not a case in which the Debtor made an isolated mistake. Instead, multiple inaccuracies and omissions appear in the Debtor's schedules. In addition to the omissions described above regarding the bank accounts, the Range Rover, the boat and trailer, the Promissory Note, the artwork, and the computer equipment, for example, the Debtor also (1) failed to list his interest in several business entities such as P & B Pet Stores, Pete & Ben, LLC, The X Group, Inc., P & B Pet Clinics, and Maxco (Transcript, pp. 50–51); and (2) inaccurately stated or manipulated the value of a 2002 Porsche 911. In several instances, such as ownership of the Range Rover and the boat, the inaccuracies could have been discovered with only minimal investigation by the Debtor.

Further, the omissions involve assets that are potentially of significant value to the estate. The artwork, for example, may be worth in excess of $140,000.00, and the Promissory Note from P & B Pet Stores represents an indebtedness owed to the Debtor in the principal sum of $390,188.00. The Range Rover was not encumbered by any liens (Transcript, pp. 36–37), and the Trustee has filed an action to recover the vehicle from Nicholas Peters (Adv.Pro.05–475).

Additionally, the Debtor's testimony at trial indicates a lack of respect for truthful disclosure. The Debtor conceded, for example, that he had puffed the numbers on the Credit Application submitted to Century Bank in 2001 because "everybody lies to get credit," and also conceded that he inflated the numbers and lied on the financial disclosures in his divorce proceeding. (Transcript, pp. 68–71). Such a history of disregard for the truth is probative of the Debtor's fraudulent intent in this case. See *In re Eigsti*, 323 B.R. at 784.

Finally, the Debtor is not an unsophisticated individual. On the contrary, he is a businessman who was involved in the formation of several business entities, and who had purchased more than $563,000.00 worth of fixtures and equipment in connection with a Franchise Agreement with the Plaintiff. The Debtor understood the significance of truthful disclosure and of signing his schedules under oath. (Transcript, p. 77). He had filed a prior Chapter 13 case, and also had filed a petition under Chapter 11 of the Bankruptcy Code on behalf of P & B Pet Stores, Inc., Case No. 03–5082. The Debtor was familiar with the bankruptcy process and the requirements of the bankruptcy laws.

Under these circumstances, the Court finds that the Debtor knowingly made false oaths on his bankruptcy schedules that were fraudulent and material. His discharge should be denied pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

## II. Section 727(a)(2)(B)

■ At trial, the Plaintiff made an oral motion to amend its Complaint to add a cause of action under § 727(a)(2)(B) of the Bankruptcy Code. According to the Plaintiff, the request was made based on evi-

dence discovered shortly before trial. (Transcript, p. 9). Section 727(a)(2)(B) provides:

**11 USC § 727. Discharge**

(a) The court shall grant the debtor a discharge, unless—

.    .    .    .    .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

.    .    .    .    .

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(B). To establish a claim under § 727(a)(2)(B), a plaintiff must show that (1) there was a concealment, (2) after the filing of the petition, (3) of property of the estate, (4) by the debtor with the intent to hinder, delay, or defraud his creditors. *In re Johnson*, 301 B.R. 590, 596 (Bankr.N.D.Ala.2003).

In this case, the Plaintiff's claim under § 727(a)(2)(B) arises from the Debtor's testimony that he abandoned his 2002 Porsche 911 in November of 2004, approximately nine months after the bankruptcy petition was filed. Specifically, the Debtor testified:

I was in Ybor City and I had been drinking and I did not want to drive under the influence. I left the vehicle there. When they [SunTrust] called me the following week for the vehicle, I told them where they could locate that vehicle.

(Transcript, p. 58). The Debtor further testified that he left the keys in the car at the time that he abandoned it. (Transcript, pp. 60–61).

The Debtor's trial testimony is inconsistent with the records of SunTrust Bank, the holder of the lien on the vehicle. According to Charles David Atkins, a bankruptcy repossession specialist with SunTrust Bank, the Bank did not receive any information from the Debtor in November of 2004 regarding the location of the vehicle. (Doc. 38, Deposition transcript of Atkins). Instead, the Bank's records reflect that the Debtor informed a Bank representative on January 3, 2005, that the Porsche was missing from his home. (Deposition transcript, p. 7). One month later, on February 1, 2005, the Debtor advised a Bank representative that he had left the keys in the car while he went into a bar, and that the car was gone when he came out. (Deposition transcript, p. 8). The Debtor has never filed a police report regarding the theft of the vehicle, and SunTrust Bank has never located the vehicle. (Deposition transcript, pp. 9, 11).

Although the evidence regarding the Porsche is troublesome, the Court finds that the Plaintiff has not established its claim under § 727(a)(2)(B), because it has not shown that the Porsche was property of the estate at the time of the Debtor's alleged concealment.

The vehicle was listed on the Debtor's schedules and claimed as exempt. The Chapter 7 Trustee and the Plaintiff both filed objections to the Debtor's claim of exemptions, and both objections were sustained. (Docs.24, 28, 40, 43).

On July 23, 2004, however, the Trustee filed a Report and Notice of Intention to Sell Property of the Estate "As Is." (Doc. 30). In the Notice, the Trustee proposed to sell all of the personal property listed in the Notice to the Debtor for the sum of $3,000.00. The Porsche was listed in the Notice. No objections to the proposed sale were filed.

The record is not clear as to whether the Debtor has complied with the terms of the sale. (Docs.68, 73). Nevertheless, on August 18, 2004, SunTrust Bank filed a Motion for Relief from the Automatic Stay with respect to the Porsche. (Doc. 39). According to the Affidavit filed with the Motion, the Debtor had not made a payment since January 5, 2003, and the total amount of the lien on the vehicle as of July 30, 2004, was $55,587.72. The appraised value of the vehicle was $51,000.00.

The Trustee did not file an objection to SunTrust's Motion, and on September 17, 2004, the Court entered an Order Granting Relief from the Automatic Stay in favor of SunTrust. (Doc. 45). The Order specifically permitted SunTrust to pursue its in rem remedies against the Porsche. On December 28, 2004, the Court entered an Order denying the Debtor's Motion for Reconsideration of the Order lifting the automatic stay. (Doc. 64).

As set forth above, the Plaintiff was required to prove that specific property of the estate was concealed or removed after the filing of the bankruptcy petition. In this case, the Plaintiff has not satisfied its burden of proving that the Porsche was property of the Chapter 7 estate at the time of the alleged concealment. Accordingly, the Debtor's discharge should not be denied pursuant to § 727(a)(2)(B) of the Bankruptcy Code.

### Conclusion

In its Complaint, the Plaintiff asserts that the Debtor's discharge should be denied pursuant to § 727(a)(4)(A) of the Bankruptcy Code because the Debtor made false and fraudulent oaths on his bankruptcy schedules.

The Court finds that multiple inaccuracies appear on the Debtor's schedules, including the omission of various bank accounts, a vehicle, a boat and trailer, certain artwork, and an indebtedness owed to the Debtor. The omitted assets are significant and potentially valuable to the estate, and the Debtor understood the importance of full disclosure at the time that he signed the schedules. The Court finds that the Debtor engaged in a pattern of conduct that shows, at a minimum, his disregard or reckless indifference to the truth.

The Debtor made false and fraudulent oaths on his schedules, and his discharge should be denied pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

The Debtor's discharge should not be denied pursuant to § 727(a)(2)(B), however, because the Plaintiff did not show that the Debtor concealed or removed property of the estate after the filing of his petition.

Accordingly:

**IT IS ORDERED** that:

1. A Final Judgment shall be entered in favor of the Plaintiff, Petland, Inc., and against the Debtor, Josh S. Unger, on the Complaint Objecting to the Debtor's Discharge.

2. The Discharge of the Debtor, Josh S. Unger, is denied pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

3. The Discharge of the Debtor is not denied pursuant to § 727(a)(2)(B) of the Bankruptcy Code.

4. A separate Final Judgment shall be entered consistent with these Findings of Fact and Conclusions of Law.